# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| JANET DELEON, | Case No.:1:16-cv000217-REB |
| Petitioner, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| CAROLYN W. COLVIN, Then-Acting Commissioner of Social Security | |
| Respondent. | |

Pending before the Court is Petitioner Janet DeLeon's Petitioner for Review, seeking review of the Social Security Administration's final decision to deny her claim for disability benefits. *See generally* Pet. for Review (Docket No. 1). This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. ADMINISTRATIVE PROCEEDINGS

On March 13, 2013, Janet DeLeon ("Petitioner") protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning December 15, 2011. This claim was initially denied on April 24, 2013 and, again, on reconsideration on July 11, 2013. On July 25, 2013, Petitioner timely filed a Request for Hearing before an Administrative Law Judge ("ALJ"). On June 16, 2014, ALJ Luke A. Brennan held a hearing in Boise, Idaho, at which time Petitioner, represented by attorney Angela Hermosillo, appeared and testified. Impartial vocational expert, Polly A. Peterson, also appeared and testified during the same June 16, 2014 hearing.

**MEMORANDUM DECISION AND ORDER - 1**

On September 9, 2014, the ALJ issued a Decision denying Petitioner's claim, finding that Petitioner was not disabled within the meaning of the Social Security Act. Petitioner timely requested review from the Appeals Council on November 7, 2014. On March 23, 2016, the Appeals Council denied Petitioner's Request for Review, making the ALJ's decision the final decision of the Commissioner of Social Security.

Having exhausted her administrative remedies, Petitioner timely files the instant action, arguing that:

> The decision of the hearing examiner, as affirmed by [the] Appeals Council, was wrong, not supported by substantial evidence in the record, or contrary to the law and regulation because: the ALJ's decision was made against the substantial weight of the evidence in that he did not consult with the appropriate experts at the time of the hearing; he did not adequately consider the opinions of the claimant's treating providers; he did not request a consultative examination or satisfy his burden to re-contact any providers in the presence of any ambiguity or lack of clarity; he did not adequately consider Plaintiff's credibility and subjective complaints; he failed to account for the full impact Plaintiff's impairment has on her ability to function; he did not adequately consider all the factors that must be accounted for when ascertaining a plaintiff's residual functional capacity; and he also neglected to adequately consider testimony from the vocational expert that would have yielded a favorable decision.

Pet. for Review, pp. 2-3 (Docket No. 1). From this, Petitioner's arguments crystallized into the following, more specific arguments: (1) the ALJ failed to properly evaluate Petitioner's credibility; (2) the ALJ failed to properly evaluate the medical opinion evidence; (3) the Commissioner failed to establish that there is other work in the national economy that Petitioner can perform; and (4) the Appeals Council failed to properly evaluate the new evidence which was submitted in support of Petitioner's request for review of hearing decision. *See* Pet.'s Brief, p. ii (Docket No. 18). Petitioner therefore requests that the Court either reverse the ALJ's decision and find that she is entitled to disability benefits or, alternatively, remand the case for further proceedings and award attorneys' fees. *See* Pet. for Review, p. 3 (Docket No. 1).

**MEMORANDUM DECISION AND ORDER - 2**

## II. STANDARD OF REVIEW

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). Findings as to any question of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g). In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence. *Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The standard requires more than a scintilla but less than a preponderance (*see Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the record as a whole to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ. *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019. The ALJ is responsible for determining credibility and resolving conflicts in medical testimony (*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving ambiguities (*see Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences logically flowing from the evidence (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.

1982)).  Where the evidence is susceptible to more than one rational interpretation in a disability

proceeding, the reviewing court may not substitute its judgment or interpretation of the record

for that of the ALJ.  *Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir.

1985).

With respect to questions of law, the ALJ's decision must be based on proper legal

standards and will be reversed for legal error.  *Matney*, 981 F.2d at 1019.  The ALJ's

construction of the Social Security Act is entitled to deference if it has a reasonable basis in law.

*See id*.  However, reviewing federal courts "will not rubber-stamp an administrative decision that

is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying

the statute."  *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

## III.  DISCUSSION

### A.    Sequential Process

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a

sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§

404.1520, 416.920) – or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) – within

the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in

substantial gainful activity ("SGA").  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  SGA is

defined as work activity that is both substantial and gainful.  "Substantial work activity" is work

activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a),

416.972(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not

a profit is realized.  20 C.F.R. §§ 404.1572(b), 416.972(b).  If the claimant has engaged in SGA,

disability benefits are denied, regardless of how severe her physical/mental impairments are and regardless of her age, education, and work experience.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not engaged in SGA, the analysis proceeds to the second step.  Here, the ALJ found that Petitioner has not engaged in substantial gainful activity since December 15, 2011, the alleged onset date.  (AR 20).

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement.  20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. §§ 404.1521, 416.921.  If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Here, the ALJ found that Petitioner had the following severe impairment: multiple sclerosis.  (AR 20).

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the

evaluation proceeds to step four. *Id*. Here, the ALJ concluded that Petitioner's above-listed impairment, while severe, did not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments. (AR 20-21).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. §§ 404.1545, 416.945. Likewise, an individual's past relevant work is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965. Here, the ALJ determined that Petitioner has the RFC to "perform sedentary work as defined in 20 C.F.R. [§] 404.1567(a)." (AR 21). Specifically, the ALJ determined that Petitioner:

> can lift and carry 20 pounds occasionally and 10 pounds frequently. She can stand or walk for 2 hours out of an 8-hour workday but can sit for up to 6 hours out of an 8-hour workday. Specifically, the claimant can frequently climb ramps and stairs but never climb ladders or scaffolds. She can occasionally balance but can frequently stoop, kneel, crouch, and crawl. She must avoid unprotected heights and moving machinery. She can occasionally use her left upper extremity for fingering, handling, or reaching. She can frequently use her right upper dominant extremity for fingering, handling, and reaching.

(AR 21).

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of her impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate

work exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). If the claimant is able to do other work, she is not disabled; if the claimant is not able to do other work and meets the duration requirement, she is disabled. Here, the ALJ found that Petitioner is unable to perform any past relevant work. (AR 24). However, the ALJ further found that there are jobs that exist in significant numbers in the national economy that Petitioner can perform, including an out operator. (AR 25). Therefore, based on Petitioner's age, education, work experience, and RFC, the ALJ concluded that Petitioner "has not been under a disability, as defined in the Social Security Act, from December 15, 2011, through the date of this decision." (AR 26).

**B.      Analysis**

       1.      Petitioner's Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Where, as here, the Petitioner has presented evidence of an underlying impairment and the government does not argue that there is evidence of malingering, the Court reviews the ALJ's rejection of her testimony for specific, clear, and convincing reasons. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). As the Ninth Circuit has recognized, this is not an easy requirement to meet because "the clear and convincing standard is the most demanding required in Social Security cases." *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014). However, "the ALJ is not required to believe every allegation of disabling pain," otherwise disability benefits "would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Molina*, 674 F.3d at 1112.

**MEMORANDUM DECISION AND ORDER - 7**

In evaluating a claimant's credibility, the ALJ may engage in "ordinary techniques of credibility evaluation." *Id*. An ALJ may consider factors such as: (1) inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (4) the observations of treating and examining physicians and other third parties regarding the claimant's symptoms; and (5) functional restrictions caused by the symptoms. *See id*.

"A finding that a claimant's testimony is not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991)). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter*, 806 F.3d at 493. "Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning" that will allow a reviewing court "to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." *Id*. at 495.

Here, the ALJ's credibility findings are supported by substantial evidence. The September 9, 2014 Decision articulates specific, clear, and convincing reasons for determining that Petitioner's testimony was not entirely credible – particularly given the absence of objective medical evidence supporting Petitioner's claims of debilitating limitations, coupled with her daily activities and arguable refusal to take prescribed medications and use a cane.

To begin, Petitioner claims to be disabled as a result of the symptoms attendant to multiple sclerosis – namely, nausea, predominantly-left-side numbness/tingling, fatigue, vison

problems, equilibrium issues, depression, heat intolerance, inability to concentrate, forgetfulness, sun/heat sensitivity, incontinence, and dexterity issues (with exacerbation of certain of these symptoms upon the presentation of  stressful situations).  *See, e.g.*, Pet.'s Brief, pp. 4-7 (Docket No. 18).  To this end, at the June 16, 2014 hearing, Petitioner's attorney (and the ALJ) invited Petitioner to discuss the limitations associated with her multiple sclerosis, with Petitioner testifying in part:

Q:    And how has [the multiple sclerosis diagnosis] affected your life . . . .?

A:    My life has changed pretty drastically since the diagnosis.  Some of it for the good, most of it just learning how to deal with what my life is like now compared to what it was before.  Certain restrictions, certain things that I can't do.  I can't go out and be in the sun for th lengths of time.  I get run down really easily.  I miss certain things that my kids do.

Q:    How do you feel in the morning when you wake up?

A:    Most mornings, I'm still pretty tired.  I don't sleep very well at nights.  It takes awhile to get myself up and going on a daily basis.

Q:    Do you experience vision problems in the morning?

A:    I've had many days where I wake up and my vision in my eye – my left eye is very blurry and it takes awhile.  I hydrate a little bit and it gets a little better as the day progresses.  Once I'm up and moving around.

Q:    And can you tell us about the numbness and tingling.  Do you experience that every day?

A:    I do, I do.  Most of the time, my left hand is tingly and numb.  In more stressful cases, whether it's stress at home or just in general, the left side of my face gets numb and tingly.

Q:    In your function report, you noted that your left leg sometimes has a mind of its own.  Could you explain that?

A:    It's kind of what I – I call it dead leg.  I have to really focus on it to get it to work right.  When I walk, it just kind of will flop and I have a little bit of experience with that.  My mom had a stroke and she had that dead leg and it

kind of has a funny look to it. It's hard to explain without actually seeing it, but it's difficult. I have to focus on that quite a bit.

Q:    Has it caused you to fall?

A:    I'm trying to think. I don't believe that the dead leg has caused me to fall, no. My equilibrium has, so.

Q:    Do you tire easily?

A:    Yes. Yes, I do.

Q:    Can you explain or describe the tiredness for us?

A:    I have mornings where I will take my kids to school and when I come back, I will sit down in the chair and notice that three hours has passed by and I don't know what I've done. I mean, I haven't done anything, but three hours, it just goes by and I've sat there because I don't have – I'm too tired to get up and do anything.

Q:    Have you noticed specific things that make your fatigue worse?

A:    Lack of sleep, stress definitely. Stress is almost unavoidable in life, especially when you have teenagers, but stress does a lot.

Q:    How are you affected by the heat?

A:    The heat wipes me out. I get really run down if I'm out in the sun for too long. And like we were talking before this, the heat in the wintertime is almost more difficult than in the summertime, because in the wintertime, you can't just shed your clothes off because the house is – you're enclosed in the heat. In the summertime, you can at least wear shorts and a tank top and you can cool yourself off, but in the heat, everyone else in the house has to stay warm. I can't crank it down to next to nothing, so that's –

Q:    When you find yourself getting really tired, are there things that help you feel better?

A:    Mostly just rest. I rest – we do have – I have a gazebo in our back yard that I try to go out and my husband calls it my "inner peace finding," you know, I try to go out there and just relax.

Q:    Would you say that you have episodes of depression?

**MEMORANDUM DECISION AND ORDER - 10**

A:      Definitely, whenever I'm faced with days, whenever I can't do things that I normally used to be able to do.  You know?

Q:      And how do you feel during those times?

A:      It's hard to function, to have what it takes to be a mom.

Q:      Would you say that your activity changes during those times?

A:      Definitely, definitely.  I don't want to do anything.  I used to be a very social person and now I avoid it.

Q:      Have you noticed any issues with concentration?

A:      Definitely.  There's simple little things, like he has asked me to do or something needs to be mailed or whatnot, and I forget.  I don't – I don't remember.

Q:      Have you had any issues with your bladder?

A:      I have.  That's probably the most embarrassing one.  We'll be out and all of a sudden, my bladder just opens up and I've had a bladder sling put in to help, but this was before all of this, but there's no muscle control to stop that.

Q:      You mentioned that you have some issues with your equilibrium.  Can you explain that a little bit further?

A:      Just little things, like if I'm sitting down for, you know, 20 minutes or so and I stand up, I get a little dizzy and my equilibrium is off.  Just this morning in the shower washing my hair, I slipped.  I luckily caught myself.  Anytime I close my eyes, you know, to rinse my hair, my equilibrium goes kind of – kind of – it sways, I guess that's the word I'll say.  Sways from – and if I bend over and I stand back up, I think my equilibrium, I catch myself getting dizzy.

Q:      Have you experienced falls?

A:      I've only – I think I've only fallen a couple of times.  Just stumbling after I've stood up.  Bend over and I stand up, which – it's – may I take my sweater off, please? . . . .  I've fallen – I got into our boat and I got back out, just stumbled over my own feet.  Luckily, I caught myself before I fell completely.

Q:      Do you have any difficulty using your hands to grasp objects?

**MEMORANDUM DECISION AND ORDER - 11**

A:      All the time. Picking up a pen, I drop that. On occasion, makeup. I drop that all the time. Doing dishes, I've dropped a knife. Luckily, it just missed my foot. Sometimes, the numbness is in both hands. Most generally, it's just my left one. I drop things all the time. Things that I shouldn't drop and picking up. I was trying to do something the other day. I don't remember what. See, that's another thing: memory.

Q:      Do you have any difficulty opening jars?

A:      Oh, a lot of the time, yes. I have to find my kids or my husband to open jars or bottles of water because I just don't have the grip in my hands.

Q:      Do you have difficulty picking things up off the table?

A:      Yes, I do. Just any small things because I just don't have the sensitivity in my fingers that I used to.

Q:      Do you have issues with your handwriting?

A:      My handwriting has definitely changed. My signature, some days it looks like mine and other days, it doesn't. It doesn't work the way that it used to.

Q:      And do you have issues with typing?

A:      Yes, and that was one thing, my first diagnoses, I thought, "Well, at least maybe I could at least type," and I've sat down and tried to do some typing just after that, and the left hand just doesn't – I can type, but I can't be as consistent as I used to be at times. There's times when I sit down behind the computer and think, "I'll just do some of this and see how things work," and they just, they don't work the way that they used to, definitely.

Q:      Do you feel that you could do activities that require repetitive hand movements for most of an eight-hour working day?

A:      No, I don't think I could. Not for –

Q:      Do you have problems with bending or crawling?

A:      Not really.

Q:      Do you do that on a consistent basis?

A:      I bend, I don't crawl. Bending, picking, bend over to get something.

Q:      Have you experienced problems with depth perception?

A:      Yes, yes.  My depth perception is horrible.  I ran into things in our garage pulling the car in.  I just – little things like that, and that's hard to deal with because those are the little things that I used to do all the time.

Q:      Do you have any trouble getting dressed or dealing with your personal hygiene?

A:      Getting dressed is not – I wear mostly stuff that can just slip on and off. Nothing with buttons or zippers just for that fact. Showering is a chore. Some weeks, it's two or three times is all the more that I will shower, which is not very good.

Q:      You noted in your function report that you've had to have your daughters help you to the bathroom if you were having vision or equilibrium problems. How often would you estimate that that happens?

A:      It happens a couple of times a month.

Q:      Do you experience headaches?

A:      I do.  I have a couple – every week, I have at least two.

Q:      And what do you do when you get a headache?

A:      I just take Ibuprofen and drink lots of water and stay down for a few days or a little while.  I think it just depends on the severity of the headache.

Q:      As far as your housework goes, what household chores are you still able to do?

A:      I can wipe down the counters.  I will do dishes on occasion.  I do laundry if I'm feeling up to it.  Those are the kinds of things I try to do.  I try to – I want to stay as normal as I possible can.  So, I'm very thankful for my daughters.

Q:      How many hours do you think you spend doing that on a daily basis?

A:      Oh, not even an hour.  30 minutes maybe.

Q:      Do you believe you could do these things eight hours a day, five days a week?

A:      No.

**MEMORANDUM DECISION AND ORDER - 13**

Q:    Would you say that you have good days and bad days?

A:    Yes.

Q:    Can you describe a bad day for us?

A:    A bad day would be when I get up and I can't – my vision is off.  My equilibrium is off.  I have no energy to do anything, and so I sit in a chair or sleep.

Q:    Have you had bad days that have spanned several days in a row?

A:    Yes, I have.  It takes a couple of days to get up and going again.

Q:    How often would you say that you've had episodes that have lasted more than one day?

A:    I have that at least once a month, sometimes twice a month.

Q:    How many times have you required hospital treatments for these – for the exacerbation?

A:    I've went twice.

Q:    And what have they done when you've had to go into the hospital?

A:    I.V. fluid.  The first time, MRI's, C.T. scans.  The second time was the steroid infusions.

Q:    Are you currently taking medications?

A:    No.

Q:    Have you tried medications in the past?

A:    Yes, I have.

Q:    And what was the reasoning behind why you stopped taking them?

A:    The side effects were considerably worse than what my symptoms were.

Q:    And the frequency of your doctor visits has decreased over time.  Can you explain why that is?

**MEMORANDUM DECISION AND ORDER - 14**

A:      The doctor had told me at one point that with M.S., you have to just learn to deal with the symptoms and understand what M.S. is, and I can't afford to go in every week whenever I have a new symptom.

Q:      Would you say that you have changed your lifestyle to decrease the frequency of your symptoms?

A:      Yes, I have tried to eliminate the stress, if possible.  Rest, eating, I've changed the way that I eat to try to help with some of my symptoms, which is – has been beneficial.

Q:      What would you say are the primary reasons that you don't feel you would be able to maintain employment?

A:      My inconsistencies in how I feel.  I couldn't be dependable to be at work at a certain time every day, and just not being dependable, I guess.

Q:      Does increased consistent activity increase the severity of your symptoms?

A:      Yes. . . . .

ALJ:    Ma'am, could you tell me what a typical day is like for you?  What do you do in the morning, say from 8:00 to noon? . . . .

A:      I get up, get dressed, go out and I'll water my flowers.  I come back in and the rest of the day is just basically sedentary.  I'll sit in the house.  I will do a little bit here and there.  I don't like to sit.  I can't sit.  I get stoved up [phonetic] a little bit if I sit for too long.  I'll pick up a little bit around the house and it's just very – I'm not very good with words, I'm sorry.

Q:      Are you – are you watching television?  Are you reading a book, doing cross word puzzles?

A:      Sometimes it's TV or just music.  That's about it.

Q:      Okay.  Who does the grocery shopping in your house?

A:      I will or my oldest daughter will.

Q:      Do you have any social activities that you do or church attendance, anything that gets you around other people?

A:      We go to church, but that's it.

Q:      Is that a weekly occurrence?

**MEMORANDUM DECISION AND ORDER - 15**

A:     Yes.

Q:     How long does church last?

A:     45 minutes.

Q:     Do you have any difficulties sitting there for the 45 minutes?

A:     Well, we're Catholic so it's kind of up and down.

Q:     Up and sown?  Is that helpful to you or does that aggravate things, up and down?

A:     Up and down is good.  If I sit for too long, I get – like I said, I get stoved up. My joints hurt.

Q:     Well, let's talk about that.  How long can you sit before you just have to get up and stretch?

A:     Maybe 20 minutes. . . . .

Q:     How long can you stand, and I'm talking about standing at a – not perfectly still like you're at attention, but maybe at a sink or something where you can sort of shift your weight or take a step to the side.  Howe long can you stand at a place like that before you've got to get off your feet?

A:     Only about 10 minutes.

Q:     How much weight could you lift and carry across the room?

A:     Oh, I don't know.  How would I –

Q:     A gallon of milk?

A:     Oh, I could carry a gallon of milk, yeah.

Q:     Could you carry a gallon of milk in each hand?

A:     I don't think – not in my left hand, no.

Q:     So, just one gallon?

A:     Just – yeah, in my right.

**MEMORANDUM DECISION AND ORDER - 16**

Q:    So, if a gallon of milk weighs about eight and a half pounds, you think eight to 10 pounds is your limit?

A:    I guess.  That sounds about right.

Q:    Okay.  You were talking about dropping things earlier.  Do you drop things both with the right and left hand?

A:    Yes, I do.  More consistently with the left, but the right hand, it's not as bad. It's weird.  It's the tips of my fingers that do it.  The left hand is generally the whole hand, but my right hand is getting worse.

Q:    You're right-handed, correct?

A:    Yes, I am.

Q:    Okay, so how often do you drop things with the right hand as opposed to with the left hand?  That's what I'm trying to figure out.

A:    Yeah.  Definitely not as much with the left hand.  I would say – oh, percentage-wise, it's not very high compared to the left hand.

Q:    What about your arms?  Any difficulty reaching, either overhead or straight out at should level?

A:    Yes, I do.  I get weak, My arm shakes.

Q:    That left arm again?

A:    Yes, yes.

Q:    Is that reaching straight or overhead?

A:    Both.

Q:    What about the right arm?

A:    The right arm is about 50-50.  Some days, it's fine ad other days, it's not.

Q:    You talked about having some bladder urgency.  Yes?

A:    Yes.

Q:    Now, is it frequency or is it urgency or is it both?

**MEMORANDUM DECISION AND ORDER - 17**

A:     It's urgency.

Q:     Okay, so when you've got to go, you've got to go?

A:     Well, it just comes on. It's not – because I try to go to the bathroom pretty frequently just to avoid anything.

Q:     Mm-hmm.

A:     But I've had times where I was at Costco pumping the gas to the car and I turned around and it just went – and there was nothing I could do to stop it.

Q:     Okay, so let me ask you this. Because I'm looking, for example, at Exhibit 6F, which is I think the last office note I have from Idaho Sleep and Neurology. Is that your –

A:     Yes, that's my neurologist's office.

Q:     Okay, so this is dated, May 22nd, 2013, and it says that . . . Janet's current multiple sclerosis symptom profile includes lightheadedness." Yes?

A:     Mm-hmm. Yes.

Q:     "Difficulty concentrating." Yes?

A:     Yes.

Q:     "Imbalance."

A:     Yes.

Q:     Left lower extremity weakness."

A:     Yes.

Q:     "She denies cognitive change, sensory change, incontinence, or change in weakness." Have you talked to your doctor about that issue?

A:     I have not because the last – what he had said to me at that visit, which apparently isn't in his notes, he said, "M.S., you have to learn to deal with some of these symptoms," and that was not one that we had discussed, so.

**MEMORANDUM DECISION AND ORDER - 18**

Q:     Okay.  You also talked about loss of balance or equilibrium causing you to fall.  Do you use a can or anything like that?

A:     I have one, but I don't use it.

Q:     Why not?

A:     I think it's more – I feel too young to be using a cane.

Q:     And then I had made notes reviewing your file that it looked like you should avoid cold temperatures, but you're telling me it's the other way around.  You need to avoid hot temperatures.

A:     Heat does –

Q:     Or is it both?

A:     Heat does exacerbate me if it's too much.  Cold, in the winter – in the summertime, it's good to have the cooler temperature in the house, but in the – it's an inner-body kind of an issue that I deal with.  If I can keep my core cool, I do pretty well, where in the wintertime, you're covered up with a bunch of clothes, so it's hard to just strip that off and keep it cool.  I don't –

Q:     Okay.  Any treatment other than medication?

A:     I had tried – I'm not on any right now, but I had tried acupuncture.

Q:     Any luck with that?

A:     I felt really well while I was on it.  I don't know, but it was – if it was helping or it just was relaxing.

Q:     How come you stopped?

A:     Money.  A friend of mind was – she was paying for it.

Q:     Okay.  And are you doing injections now or what kind of medication?

A:     I'm actually not on any.  The side effects to the medication were worse.

Q:     What were –

A:     The last medication that I was on was called Aubagio and both hands up to my elbow were tingly and numb.

**MEMORANDUM DECISION AND ORDER - 19**

Q:     So, is that a decision that you and your doctor made together or one that you came to?

A:     I had informed him that I was going to stop taking it because of that.

Q:     What is your doctor's name?

A:     Dr. Wade Harris.

Q:     And he's your neurologist?

A:     Yes.

Q:     Tell me about the exposure to sunlight. Does that aggravate things?

A:     It does, it does. The body temperature, the heat when it goes up like that, the exacerbation, the symptoms are irritated. My hands get worse. My face, the numbness comes back even worse –

Q:     Because it elevates your body core temperature?

A:     Yes, yes. . . . .

ATT:   You had issues with burning hands?

A:     I have. I burned my thumb a while back. I set my hand down and didn't – could not feel the heat of the – the stove, I burned my thumb, and I just recently burned my hand on the curling iron.

Q:     Right or left hand?

A:     My left hand.

(AR 41-58).

Ultimately, the ALJ ruled "that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms," before concluding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (AR 22). He did so, in part, by noting that Petitioner's allegations of debilitating symptoms are inconsistent with her own

description of daily activity levels.  *See id*.  For example, he referenced Petitioner's April 18,

2013 "Function Report - Adult," where she indicated that:

- From the time she wakes up until going to bed, she gets up, takes her kids to school, comes home, showers, picks up around the house, rests, and fixes dinner.  (AR 181).

- Her multiple sclerosis does not affect her ability to dress, bathe, care for her hair, shave, feed herself, or use the toilet.  *Id*.

- She prepares her own meals daily and performs household chores (laundry and cleaning dishes) about an hour per week, without the need for any help or encouragement.  (AR 182).[1]

- She goes outside everyday and, when "going out," she drives, and is capable of driving alone. (AR 183).

- Once a week for about an hour and a half, she shops for groceries.  *Id*.

- She is able to pay bills, count change, and use a checkbook/money orders (though she is "forgetful about some bills).  (AR 183-84).

- She exercises three times per week to the best of her abilities, albeit at a "much slower pace."  (AR 184).

- She spends time with others (going to dinner with friends every other month) and attends church and her kids' sporting events on a regular basis.  *Id*.[2]

- her multiple sclerosis affects walking, talking, memory, completing tasks, concentration, and following instructions;[3] *but not* lifting, squatting, bending, standing, reaching, sitting, kneeling, hearing, stair climbing, seeing, understanding, using hands, or getting along with others.  (AR 185).

_____

[1]  Additionally, Petitioner provided no response to the following question:  "If you don't do house or yard work, explain why not."  (AR 183).

[2]  At the same time, Petitioner indicates that she has "had to slow down and do[esn't] always go to everything [she] is invited to."  (AR 185).

[3]   In this respect, Petitioner states: "If I don't have sufficient rest, I stumble over words[;] when I talk, I have to keep notes about things that I need to do."  (AR 185).

- She can walk, depending on whether her "leg is working right,"[4] but doesn't need to rest when doing so, she just has to "go slower." *Id.*

- She finishes what she starts (conversations, shores, reading, watching movies), but, when following directions, gets distracted and has to remind herself to "check what [she's] doing." *Id.*

- She gets along well with authority figures. (AR 186).

- She doesn't use any walking aids for her multiple sclerosis. *Id.*

- She takes medication for her multiple sclerosis, but they don't cause any side effects. (AR 187).

*See also* (AR 199-209) (June 18 2013 "Function Report-Adult," noting more-or-less similar capabilities in some areas, but altogether inconsistent entries in other areas). According to the ALJ, "[t]hese significant activities of daily living certainly do not support the claimant's allegations of being precluded from any and all work-related activity.").

Additionally, the ALJ pointed to incongruities he perceived between Petitioner's allegations and the medical evidence in the record. (AR 22-23). For example:

- In February 2012, Petitioner reported that her symptoms began in October 2011 with numbness in her left cheek, fever, body aches, nasal congestion, nausea, vomiting, numbness and tingling on the left side of her face, and visual changes with difficulty focusing. (AR 313). However, an examination at that time showed that she was alert and oriented; her acuity and visual fields were intact; she had full strength throughout her body, with normal tone; her reflexes were normal; and that mild to moderate aerobic exercise 15-30 minutes five times per week was recommended. (AR 314-15); *see also* (AR 22) (referencing treating source's emphasis on "importance of staying mentally, socially, and physically active," implying that "she was capable of more") (citing (AR 337)).

- Despite Petitioner's consistent allegations of dizziness, imbalance, and concentration difficulties, other examinations showed her neurological

_____

[4] Petitioner elaborated on this in saying that "[m]y left leg sometimes has what is called a kind of dead leg where it will just flop a little when I walk." (AR 187).

system was generally intact and that she could pay attention. (AR 304, 308, 311, 328, 344, 347, 362, 366, 369).

- Despite Petitioner's "dead leg," and its claimed propensity to "kind of flop," on numerous occasions, Petitioner denied "gait instability" and medical staff observed that she walked with a normal gait. (AR 298, 303-04, 307-08, 311, 313-14, 344, 347, 361-62, 365-66, 369, 371-72).

- Despite testifying to have fallen, at least as of February 2013, Petitioner admitted that she had no falls. (AR 298).

- Petitioner complained that her Rebif injections caused bruising and pain, *not* that the side effects were worse than the symptoms of multiple sclerosis. (AR 303). To be sure, not only did Petitioner twice document that her medication did cause side effects (*see supra*), throughout the record, various medications were frequently discussed with Petitioner and Petitioner expressed interest in pursuing certain of these medications. (AR 304).

These contradictions with the medical record are relevant considerations in discounting Petitioner's credibility. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (holding that ALJ may consider lack of medical evidence but it cannot be the only factor supporting adverse credibility finding); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective . . . testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is till a relevant factor in determining the severity of the claimant's symptoms and their disabling effects.") (citing 20 C.F.R. § 404.1529(c)(2)).

Together, these reasons offer clear and convincing explanations as to why the ALJ did not find Petitioner's testimony entirely credible. This is not to say, however, that the Court conclusively finds Petitioner not to be disabled under the applicable rules and regulations, or that Petitioner does not suffer from the symptoms of multiple sclerosis; indeed, as expected, Petitioner identifies conflicting evidence in support of her position. While such conflicting evidence may not have been given the weight Petitioner would have preferred, the ALJ's

decision to doubt Petitioner's credibility in denying disability benefits contains clear and convincing reasons for doing so. As required by controlling law, the ALJ will not be second-guessed as to such conclusions, on the record here and the justifications provided. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190 (9th Cir. 2004) ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision.") (internal citations omitted). Therefore, the Court will not substitute its judgment when the evidence in the record can support the ALJ's findings.[5]

    2.    <u>Petitioner's Treating Physicians' Opinions</u>

The medical opinion of a treating physician is entitled to special consideration and weight. *See Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). Such deference is warranted because the treating physician "is employed to cure and has a greater opportunity to know and observe the individual." *Id.* However, a treating physician's opinion is not necessarily conclusive. *See id.* at 762. If the treating physician's opinions are not contradicted by another doctor, they may be rejected only for clear and convincing reasons. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Even if the treating physician's opinions are contradicted by another doctor, they can only be rejected if the ALJ provides specific and legitimate reasons supported by substantial evidence in the record. *See id.* A lack of objective medical findings,

---

[5] The ALJ's reliance on the fact that Petitioner stopped working in December 2008 (before her alleged onset date) to care for her mother in support of his credibility determination is not convincing and not entitled to deference. (AR 22). Petitioner admitted that, even though she stopped working to care for her mother in 2008, she believed her multiple sclerosis became severe enough to keep her from working on December 15, 2011 (her onset date). (AR 168). Standing alone, this sequence of events is perfectly reasonable, and does not operate to detract from Petitioner's credibility. Even so, as discussed, the record does supply *other* reasons to support the ALJ's credibility determination. *See supra.*

treatment notes, and rationale to support a treating physician's opinions is a sufficient reason for rejecting that opinion.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

Petitioner argues that the ALJ failed to properly evaluate the medical opinion evidence, in particular, the opinions of her treating neurologist, Dr. Wade Harris.  *See* Pet.'s Brief, p. 13 (Docket No. 18).  As to those opinions, in a September 30, 2013 "Multiple Sclerosis Medical Source Statement," Dr. Harris reported Petitioner's prognosis as "good/fair," alongside Petitioner's symptoms, including chronic fatigue, balance problems, paresthesias, weakness, intention tremor, blurred vison, difficulty remembering, sensitivity to heat, unstable walking, muscle fatigue of limb, vertigo, double vision, emotional liability, and numbness.  (AR 396).[6] Dr. Harris also reported that Petitioner had significant reproducible fatigue of motor function with strength testing; she has a need for a cane to address her muscle weakness and imbalance; she can frequently lift and carry less than 10 pounds, and occasionally carry 10 pounds; she can occasionally twist, stoop, and crouch; her upper extremities are somewhat limited due to pain, muscle weakness, tremors, and fatigue; she can grasp 90% of the time and finger 75% of the time with her right hand/fingers (with no limitations reaching), but is limited to grasping and fingering only 5% of the time with her left hand/fingers (and can reach 90% of the time); and she is likely to be "off task" more tan 25% of the time.  (AR 396-99).  Ultimately, Dr. Harris opined that Petitioner is incapable of working, even in a low-stress job (but that varies).  (AR 399).

In his Decision, the ALJ gave Dr. Harris's opinions in these respects "little weight" because, he wrote, "[w]hile Dr. Harris is a treating source, this opinion is not consistent with the record as a whole which reveals nothing more than subjective complaints."  (AR 23).  Petitioner

---

[6] Of some interest, although Petition claims difficulties in such areas, Dr. Harris did not report any symptoms of depression, bladder problems, confusion, loss of manual dexterity, poor coordination, or speech difficulties.  (AR 396).

**MEMORANDUM DECISION AND ORDER - 25**

takes issue with this, arguing that the ALJ "failed to provide the requisite clear and convincing reasons for rejecting [Dr. Harris's] opinion" and, "[i]n doing so, the ALJ improperly weighed the medical evidence." Pet.'s Brief, p. 13 (Docket No. 18). The Court has examined this criticism, but after its own review, the Court is satisfied that the record supports the ALJ's decision to place little weight to these particular findings.

First, to the extent Dr. Harris definitively considered Petitioner disabled as of September 30, 2013, his opinion on the ultimate issue (within the meaning of the Social Security Act) is neither conclusive nor binding upon the ALJ. *See Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989); *see also* SSR 96-5p, *available at* 1996 WL 374183, *2 (the "final responsibility for deciding [whether an individual is 'disabled' under the Social Security Act] . . . is reserved to the Commissioner."); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability.").

Second, Dr. Harris's treatment notes over time do not neatly align with the physical limitations he ultimately assigns to Petitioner in the "Multiple Sclerosis Medical Source Statement." It is true that there are references in his notes to Petitioner's multiple sclerosis and her presented symptoms. But whether Petitioner suffers from this impairment is not the pertinent ultimate issue here. To be clear, the ALJ found in no uncertain terms that Petitioner's multiple sclerosis was "severe," and that Petitioner's residual functional capacity is negatively impacted. *See supra* (citing (AR 20-24)). And, for the most part, Dr. Harris's treatment notes reflect Petitioner's periodic subjective complaints of pain. However, largely absent from such notes are any corresponding opinions or findings from Dr. Harris paralleling the opinions reached in the "Multiple Sclerosis Medical Source Statement" as to Petitioner's alleged functional limitations. As noted above, the record (including from Dr. Harris) contains instances where Petitioner was

not in acute distress, had full strength in her body with normal tone, had intact neurological and cognitive systems, and had no problems walking. *See supra* (citing (AR 298, 303-04, 307-08, 311, 314, 328, 344, 347, 361-62, 365-66, 369, 371-72)).

Third, an ALJ properly can reject "check-off reports that [do] not contain any explanation of the bases of their conclusions." *See, e.g.*, *Molina*, 674 F.3d at 1111 (9th Cir. 2012); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *see also Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (observing, sensibly, that the regulations "give more weight to opinions that are explained than to those that are not."); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ may reject physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been properly discounted as not credible [(*see infra*)]."); *Ellison v. Colvin*, 2014 WL 4853126, *6 (D. Idaho 2014) ("When a physician relies on Petitioner's subjective complaints, which the ALJ properly discounted in an adverse credibility determination, that is a legally sufficient reason on which the ALJ could properly rely to accord less weight to [physician's] opinion."). Because Dr. Harris's opinions in his "Multiple Sclerosis Medical Source Statement" arguably appear to reflect Petitioner's subjective complaints over time, the ALJ did not err in calling its conclusions as to Petitioner's physical abilities into question.

Third, Dr. Harris's opinions drawn from the "Multiple Sclerosis Medical Source Statement" do not exist in isolation. On July 11, 2013, medical consultant Wade Dickey, M.D., reviewed Petitioner's medical records and opined that Petitioner could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk for two hours and sit for six hours in an eight-hour day, with some postural limitations. (AR 79-81). According to Dr. Dickey, Petitioner was capable of sedentary work with some limitations:

We have received your request for reconsideration. All prior evidence and any newly submitted evidence in file has been thoroughly reviewed. Medical reports indicate you are being treated for multiple sclerosis. There is no evidence of a severe mental condition as a result. Your condition does not seriously affect[ ] your ability to stand, walk, or use your arms or legs.

Your condition results in some limitations in your ability to perform work related activities. We have determined that your condition is not severe enough to keep you from work. We considered the medical and other information, your age and education in determining how your condition affects your ability to work. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other seated types of work with limited walking, standing, lifting, and carrying.

(AR 83). The ALJ afforded Dr. Dickey's opinion "great weight, pointing out that it was more in line with the balance of the medical record and Petitioner's "relatively benign" examinations. (AR 24). *See Ruiz v. Colvin*, 638 Fed. Appx. 604, 606 (9th Cir. 2016) ("The ALJ did not err in giving the opinion evidence from State agency medical consultants greatest weight. . . . . Although the State consultants never examined Ruiz, the ALJ found their opinions consistent with the greater medical record, progress and treating notes, and Ruiz's description of her daily activities.") (citing SSR 96-6p, *available at* 1996 WL 374180, *3 (ruling that opinion of State agency medical consultant can be given more weight than that of treating source in appropriate circumstances).

With all this in mind, there is no question that Petitioner suffers from an impairment (acknowledged as "severe" by the ALJ) that impacts her ability to work; however, the ALJ provided specific legitimate reasons for rejecting/questioning certain of Dr. Harris's opinions. Ultimately, Dr. Harris's opinions were not given the weight Petitioner would have preferred; however, such opinions clearly were considered in the context of the surrounding medical record.

**MEMORANDUM DECISION AND ORDER - 28**

The Court's duty here is not to resolve the conflicting opinions and ultimately decide whether Petitioner is once-and-for-all disabled as that term is used within the Social Security regulations. Rather, the Court must decide whether the ALJ's decision that Petitioner is not disabled is supported by the record. In this record, there are conflicting medical opinions, testimony, and accounts that inform the ALJ's decisions on how to consider Dr. Harris's opinions. His decision to discount such opinions is supported by clear and convincing, specific, and legitimate reasons for doing so. Hence, because the evidence can reasonably support the ALJ's conclusions in these respects, the Court will not substitute its judgment for that of the ALJ's even if the Court were to have a different view. *See Richardson*, 402 U.S. at 401; *Matney*, 981 F.2d at 1019.

3.  Other Work in the National Economy

Petitioner contends that the ALJ posed a hypothetical question to the vocational expert that presumed an incorrect RFC, insofar as it was not consistent with either the Petitioner's own testimony, or the limitations reflected in Dr. Harris's opinions. *See* Pet.'s Brief, pp. 16-18 (Docket No. 18). The Court agrees with Respondent that this argument "is entirely contingent on the success of [Petitioner's] previous arguments, namely [that] the ALJ should have afforded more weight to her allegations and Dr. Harris's opinion." Resp.'s Brief, p. 11 (Docket No. 19). As stated above, the ALJ reasonably questioned Petitioner's allegations and Dr. Harris's opinions when arriving upon the RFC used in the hypothetical to the vocational expert. *See supra*. As such, the ALJ did not pose an improper hypothetical question to the vocational expert. *See, e.g.*, *Sieler v. Berryhill*, 2017 WL 2676491, *5 (E.D. Wash. 2017) ("The RFC determination and the VE hypothetical took into account those limitations supported by the record that did not

depend on the Plaintiff's subjective complaints that lacked credibility.") (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005)).

4.  The Appeals Council's Evaluation of New Evidence

As to situations involving new evidence submitted to the Appeals Council for the first time, 20 C.F.R. § 404.970(b) states:

> If new and material evidence is submitted, the Appeals Council . . . shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently in the record.

Following the ALJ's September 9, 2014 Decision, Petitioner submitted a follow-up letter from Dr. Harris for the Appeals Council's consideration. (AR 400). In denying Petitioner's Request for Review, the Appeals Council stated:

> In looking at your case, we considered the reasons that you disagree with the decision *and the additional evidence listed on the enclosed Order of the Appeals Council, with the entire record. The additional evidence includes a narrative letter from Wade S. Harris, M.D., dated November 20, 2014 (1 page).* We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(AR 2) (emphasis added). Petitioner argues that this is not enough. *See* Pet.'s Brief, p. 19 ("Despite specific acknowledgment of this new evidence, however, the Appeals Council failed to properly evaluate the new evidence as required.").

The Court disagrees. "[T]he Appeals council only is required to 'consider' and 'evaluate' the additional evidence. No mention is made of any requirement that the Appeals Council explain its decision." *Woodsum v. Astrue*, 711 F. Supp. 2d 1239, 1246 (W.D. Wash. 2010) (citing and adopting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992) and *Hollar v.*

**MEMORANDUM DECISION AND ORDER - 30**

*Comm'r Soc. Sec. Admin.*, 1999 WL 753999, *1 (4th Cir. 1999)). The Appeals Council supplied

the necessary information in this respect. Regardless, the Court finds that Dr. Harris's

November 20, 2014 letter essentially mirrors the opinions reflected in his September 30, 2013

"Multiple Sclerosis Medical Source Statement." In other words, this letter supplements only be

repeating what is already in the record – evidence that had already been considered by the ALJ.

Therefore, there is no basis to remand the action in this respect.

## IV. CONCLUSION

The ALJ is the fact-finder and is solely responsible for weighing and drawing inferences

from facts and determining credibility. *Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d

at 1394; *Sample*, 694 F.2d at 642. If the evidence is susceptible to more than one rational

interpretation, one of which is the ALJ's, a reviewing court may not substitute its interpretation

for that of the ALJ. *Key*, 754 f.2d at 1549.

The Court concludes that the evidence relied upon by the ALJ – coupled with the

additional evidence submitted post-hearing – can reasonably and rationally support the ALJ's

conclusions, despite the fact that such evidence may be susceptible to a different interpretation.

Accordingly, the ALJ's decisions as to Petitioner's disability claim were based on proper legal

standards and supported by substantial evidence. Therefore, the Commissioner's determination

that Petitioner is not disabled within the meaning of the Social Security Act is supported by

substantial evidence in the record and is based upon an application of proper legal standards.

The Commissioner's decision is affirmed.

///

///

**MEMORANDUM DECISION AND ORDER - 31**

## V. ORDER

Based on the foregoing, the decision of the Commissioner is AFFIRMED and this action

is DISMISSED in its entirety, with prejudice.

DATED: **September 29, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge